John Phil **FELBURN**, Plaintiff,

v.

The **NEW YORK CENTRAL R. R. CO.**, **Fruehauf Trailer Company**, **Defendants.**

**Civ. A. No. 36021.**

United States District Court
N. D. Ohio, E. D.
Jan. 7, 1964.

Albert R. Teare, Donald A. Teare, Teare, Fetzer & Teare, Cleveland, Ohio, trial attys., Michael Williams, Warren, Ohio, of counsel, for plaintiff.

W. A. Wilkinson, John F. Dolan, Cleveland, Ohio, William C. Conner, Curtis, Morris & Safford, New York City, trial counsel, for defendants.

CONNELL, Chief Judge.

### Findings of Fact

1. This is an action for infringement of two U. S. patents, Nos. 2,693,889 and 3,002,636, which were issued to and are owned by plaintiff, and which relate to freight handling equipment and methods. The Complaint charges infringement of both of the two patents in suit by the "Flexi-Van" freight handling system, in both its original and its modified "Mark III" versions, as used by defendant New York Central Railroad, employing equipment manufactured by defendant Fruehauf Trailer Company.

2. The Answer denies infringement of both patents, and alleges that both patents are invalid because the alleged inventions respectively covered thereby were not new and did not involve patentable invention.

3. The Fellabaum patent No. 2,693,-889, which was issued to plaintiff prior to his change of name from Fellabaum to Felburn, relates to a semi-trailer and tractor assembly the trailer portion of

which may be spotted for loading, unloading or repairs, independently of the tractor and the wheel assembly or bogie, thereby freeing the tractor and bogie for other uses.

The rear end of the trailer is provided with a depending cam surface which is engageable with a bumper block at the edge of a load carrying platform of a vertical height slightly above that of the trailer, so that the tractor may back the trailer against the bumper block to cam the rear portion of the trailer up onto the bumper block and remove its weight from the bogie. The undersurface of the trailer is provided with tracks extending the full length of the trailer to permit longitudinal sliding movement of the bogie. A hitch or draft means connects the front end of the bogie to the rear end of the tractor so that after the rear end of the trailer has been backed onto the bumper block, the tractor may be driven away, pulling the bogie along the tracks at the undersurface of the trailer and out from under the front end of the trailer. Removable jacks are provided to support the front end of the trailer after removal of the tractor and bogie, these jacks being spaced at the outer sides of the trailer to permit the bogie to be withdrawn between them.

Only one of the four claims of the patent, Claim 3, is here in suit. It is asserted against both the original "Flexi-Van" and the Mark III Systems.

4. The Felburn patent No. 3,002,636 relates to a method of transferring the trailer bed of a semi-trailer and tractor assembly having a detachable wheel assembly or bogie to a railway "flat car" by the successive steps of: backing the trailer bed by means of the tractor in a direction generally perpendicular to the longitudinal axis of the flat car to a position wherein the rear end of the bogie engages the side of the flat car; removing the locking pins in the tow bars to permit telescoping of the tow bars; backing the tractor to push the trailer smoothly over the bogie and onto the floor of the flat car to the point where a V-shaped slot at the bottom of the trailer is engaged with a kingpin projecting upwardly from the flat car to form a pivot for rotation of the trailer on the flat car; attaching a separate towing and lifting vehicle to the front of the trailer to relieve the weight of the trailer from the tractor and bogie and support the trailer solely upon the flat car and the towing vehicle; and swinging the trailer by the towing vehicle to a position wherein the trailer is aligned with the flat car.

Of the fifteen claims of the '636 patent, three (Claims 11, 14 and 15) are charged to be infringed by the original Flexi-Van system, and seven (Claims 1, 3, 4, 11, 12, 14 and 15) are asserted against the Mark III system.

5. The original Flexi-Van system employs a specially built railroad car having a rotatable turntable which is raised and lowered by means of a hydraulic jack. The frame of the railroad car consists of a single, relatively narrow girder, the ends of which rest upon the wheel trucks of the car and the central portion of which is recessed to receive the turntable. The bogie is slidable on rails extending lengthwise of the undersurface of rear portion only of the trailer. The turntable is provided at its upper surface with a pair of skids which are also adapted for sliding engagement with the rails on the trailer.

To load the trailer onto the railroad car, the turntable is rotated to orient the skids transversely of the car. The trailer is then backed by the tractor transversely of the railroad car to a point opposite the ends of the skids on the turntable. Then the bogie is unlocked from the trailer and the tractor is backed to push the trailer smoothly from the bogie onto the skids of the turntable to a position wherein the trailer is centered lengthwise on the turntable. Thereupon the tractor is disconnected from the trailer, and the turntable is raised by the hydraulic jack to lift the trailer off of the bogie. The turntable is then rotated by hand to align the trailer with the railroad car, whereupon the hydraulic jack is again actuated to lower the trailer to a

point where its two ends are supported on the railroad car and the depending kingpin at the front end of the trailer is lowered into a recess on the railroad car to lock the trailer against rotation.

After the trailer has been lifted off the bogie and rotated parallel to the railroad car, the bogie may then be connected to the tractor and hauled away for other use. This is accomplished by a removable towbar which is temporarily attached to the bogie during the towing operation, and which is provided at its forwardly projecting end with a cam surface which is engaged by the tractor as the tractor is backed up toward the bogie, thereby raising the front wheels of the bogie off the ground to permit turning of the bogie without scrubbing of the tires.

6. In the Flexi-Van Mark III system, the railroad car is generally similar to that used in the original Flexi-Van, except that no hydraulic jack is provided for raising and lowering the turntable. Instead, the outer ends of the skids on the turntable are provided with inclined surfaces which engage the rear end of the trailer as it is backed onto the turntable by a special "Commando" tractor to cam the trailer up off of the bogie. The trailer is not backed to a balanced position on the turntable, as in the original Flexi-Van, but only to the point where its rear end is supported on the turntable. During this operation, the fifth wheel of the tractor is raised by a built-in hydraulic jack to lift the front end of the trailer up to the same height as its rear end. A transversely extending nose wheel mounted for vertical movement at the front end of the tractor is then lowered into contact with the ground, raising the regular front wheels of the tractor off the ground. This nose wheel is rotated to swing the front end of the tractor in a circular arc around to a position where the tractor is perpendicular to the front end of the trailer. Then the nose wheel is raised out of engagement with the ground, lowering the front wheels of the tractor again to the

ground, and the tractor is backed to swing the front end of the trailer around to a position adjacent the railroad car. At that point, a special hydraulic ram on the tractor pushes the front end of the trailer the remaining short distance to the point where the trailer is parallel to the railroad car.

After the trailer is thus removed from the bogie, the bogie is carried away on hinged arms at the rear end of the "Commando" tractor, these arms being extended and inserted beneath the bogie and raised to lift the bogie completely off the ground.

7. The two Flexi-Van systems were conceived and developed by Leo L. Mellam, President of New York Central Transport Company, in conjunction with engineers of the Strick Division of Fruehauf Trailer Company. Their work was done entirely independently of Felburn, and they obtained a number of patents of their own covering the basic system and the components thereof.

8. In early 1947, a set of experimental equipment for the original Flexi-Van system was constructed. This equipment was publicly demonstrated in New York during the first week in May 1957, with resulting widespread publicity. Some of the publications describing the Flexi-Van system came to the attention of Felburn himself.

9. In April, 1958, the Flexi-Van equipment went into regular commercial service on the New York Central [p. 8].

10. During the latter part of 1960, after several years of use of the original Flexi-Van equipment, the Mark III equipment was designed and developed, to achieve several operating advantages over the original equipment [p. 8]. The Mark III equipment went into use in mid-1961; when the manufacture of this new equipment was commenced, production of the original Flexi-Van equipment was substantially terminated.

11. Felburn, although the head of both a truck-trailer equipment manufacturer and a trucking company, admitted-

ly never used either of his two systems commercially. He did contact a large number of railroads and equipment manufacturers in an attempt to interest them in his various freight handling ideas, but without any success.

12. After he learned of the original Flexi-Van system, Felburn added a new sheet of drawings to one of his three applications for the '636 patent, showing a method more similar to the Flexi-Van system than that which he had previously disclosed, and he also added a number of broader claims which were obviously intended to cover Flexi-Van, but all these claims were rejected and ultimately cancelled.

13. Claim 3 of the Fellabaum '889 patent is not applicable to the equipment used in either Flexi-Van system.

14. The entire combination recited in Claim 3 of the '889 patent is applicable to the conventional semi-trailer combinations with sliding bogies which were in prior use, except for the following two allegedly novel elements:

A. A "depending cam surface" at the rear portion of the trailer base engageable with a load carrying platform of a vertical height slightly higher than that of said rear portion whereby the tractor unit may back the trailer base against said platform with sufficient force to cam said rear portion upwardly to overlie said platform so that the rear end of the trailer base is removed from the bogie.

B. Draft means for connecting the bogie to the tractor for moving the bogie "from a position underlying said trailer base".

15. The cam means is a critical element in Claim 3, because it was not present in any of the claims as originally filed but was added during the course of prosecution to overcome the rejection of the claims by the Patent Office, and Fellabaum argued that it distinguished the claims from the prior art cited by the Patent Office.

16. In the original Flexi-Van system, there is an inclined surface at the outer end of the skids of the turntable on the railroad car and cooperating inclined surfaces at the rear ends of the rails on the bottom of the trailer, but the purpose of these inclined surfaces is merely to take care of the extreme case where the roadway at the side of the railroad track is more than four inches below the tracks. Under all normal conditions, the turntable can be and is lowered to the point where the trailer body can be slid smoothly from the bogie onto the skids of the turntable on the railroad car with no upward camming action at all.

17. The inclined surfaces at the rear end of the rails on the trailer used in both Flexi-Van systems are not "depending" cam surfaces of the type called for in Claim 3 of the Fellabaum '889 patent, as that expression was defined and used during prosecution of the application for the '889 patent. Felburn argued to the Patent Office that the "depending cam surfaces" called for in his claims would permit the trailer to be backed up at any of a number of different lateral positions along the load carrying platform, thereby dispensing with the necessity of precise lateral positioning of the trailer relative to the supporting platform as was required in the systems disclosed by the prior patents cited by the Patent Office.

18. Neither the original nor the Mark III Flexi-Van equipment has cam means of this type. Instead, in both systems, projecting downwardly beneath the inclined surfaces at the rear ends of the rails on the trailer are side flanges which fit closely against the sides of the skids of the turntable to guide the trailer body as it is slid onto the turntable. Thus, when the Flexi-Van trailer is backed onto the turntable it must be precisely positioned laterally relative to the turntable skids.

19. The "draft means" is also a critical element in Claim 3, because Fellabaum was unable to obtain any claims which did not include this element. During prosecution of the application for the '889 patent, he attempted to get a number of claims which did not call for the draft

means, including at least three claims which included all of the elements contained in Claim 3 except for the draft means, and all of these other claims were rejected and cancelled. He also urged that the draft means distinguished his claimed invention from the prior art.

20. Neither Flexi-Van system includes "draft means" of the type recited in Claim 3.

21. The original Flexi-Van system does include a towbar which is used to connect the tractor to the bogie for hauling the bogie independently of the trailer body. However, this towbar is much too short to reach from the tractor to the bogie when the bogie is in its normal position beneath the trailer. Moreover, since the towbar is provided with a cam surface which raises the front wheels of the bogie off the ground when the towbar is engaged by the tractor, even if the towbar were long enough to reach from the tractor to a bogie positioned beneath the trailer, it could not be connected between them while the bogie is beneath the trailer. Thus, the towbar of the original Flexi-Van system cannot be used to pull the bogie "from a position underlying the trailer" as specified in Claim 3.

22. The Mark III system has no towbar at all. Instead, the bogie is hauled independently of the trailer by foldable arms at the rear end of the special Commando tractor which are inserted beneath the bogie and raised to lift the bogie completely off the ground. These arms obviously cannot be used while the bogie is in a "position underlying the trailer," as required by Claim 3.

23. The system disclosed in the '889 patent is different in concept, construction and operation from the Flexi-Van systems. In the tractor and semi-trailer combination disclosed in the '889 patent, the bogie is attached to the tractor at all times during use by a telescoping towbar, and the presence of the bogie and towbar behind the tractor would prevent backing of the tractor sufficiently close to a railroad car to push the trailer to a centered position on the car, as is done

in the original Flexi-Van system. Conversely, the trailers of the two Flexi-Van systems could not be spotted in the manner disclosed in the '889 patent, not only because of the lack of towbar for pulling the bogie from under the trailer, as discussed above, but also because the rails which permit sliding movement of the bogie do not extend under the front portion of the trailer, and because the supporting legs of the trailer are too closely spaced to permit pulling of the bogie between them to leave the front end of the trailer supported on the legs, as disclosed in the '889 patent.

24. The claims of the Felburn '636 Patent in suit are not applicable to the methods performed in either of the two Flexi-Van systems.

25. Neither Flexi-Van system employs a "Flat-Car" as called for in all of the claims of the '636 Patent.

26. An interpretation of the expression "flat-car" sufficiently broad to cover the specially designed railroad cars employed in the two Flexi-Van systems would be inconsistent with the limited definition which Felburn applied to the expression during the prosecution of his applications for the '636 patent, in order to persuade the Patent Office to grant the patent.

27. After all of the claims of his first application for the '636 patent had been rejected by the Patent Office, Felburn amended the specification to define the expression "Flat car" as used in his claims, as a "railway car wherein the platform lies in a common plane throughout the load carrying area * * *".

28. As limited by this definition, the term "flat car" would not apply to the special railroad cars used in either of the two Flexi-Van systems, since neither rail car has an upper surface which "lies in a common plane".

29. During prosecution of his three applications for the '636 patent in suit, Felburn repeatedly told the Patent Office that his invention involved the use of "conventional flat botton flat cars" and

therefore differed from prior systems involving expensive, specially constructed flat cars having special attachments which reduced their utility for other purposes.

30. Felburn also repeatedly told the Patent Office that adding a turntable to a conventional railroad flat car was contrary to his concept, since such a modification would add to the height and cost of the car, even to the point of rendering the cost "prohibitive." He even stated expressly that a railway car which is provided with a turntable is not the "equivalent" of the "flat car" called for in his claims.

31. Felburn also told the Patent Office that a car which had a compensating recess to lower the height of the trailer on the car is not a "flat car" within the meaning of his claims.

32. Felburn further repeatedly and emphatically told the Patent Office that according to his invention the trailer bed is rotated while in "direct contact" with the floor of the flat car.

33. As thus limited to the loading of trailers onto conventional flat bottom flat cars without a turntable or other special equipment, the claims of the '636 patent do not apply to the specially built rail cars of the Flexi-Van systems, which have turntables, which have no load supporting floors, and are neither adapted for nor used for handling conventional loads.

34. In neither Flexi-Van system are swivel means under the trailer body registered with swivel means on the rail car to form a pivot, as called for in Claims 1, 3, 4, 14 and 15 of the '636 patent.

35. During prosecution of his applications for the '636 patent, Felburn argued that this language in his claims requires that a pivot-forming part be provided on the bed of the trailer to cooperate with a complementary pivot-forming part on the flat car.

36. In neither Flexi-Van system is there any swivel means on the trailer body which is registered with swivel means on the rail car to form a pivot. Instead, the rail cars of both Flexi-Van systems are provided with rotatable turntables which are permanently mounted on the cars. In each system, the pivotal mounting for turntable exists before the trailer is placed on the car and is not formed by registering anything on the trailer with anything on the rail car.

37. Plaintiff's attempt to apply to the Flexi-Van systems the language of his claims which calls for registering swivel means to form a pivot is therefore inconsistent with his argument to the Patent Office that it "necessitates that a pivot forming part be provided on the bed of the trailer".

38. Neither Flexi-Van system involves the use of a towing vehicle in the manner described in Claims 1, 3, 4 and 12 of the '636 patent.

39. In the Mark III system, the swinging of the trailer body on the railroad car is accomplished by the same tractor which pushes the trailer body onto the flat car, rather than by a "towing vehicle" which relieves the weight of the trailer from the tractor, as called for in Claims 1, 3, 4 and 12.

40. In the Mark III system there is no towing vehicle which is "offset from the tractor", as more specifically recited in Claims 3 and 4.

41. In the Mark III system, there is no towing vehicle which performs the step of "lifting" the front end of the trailer to relieve its weight from the tractor as further recited in Claim 12.

42. In neither Flexi-Van system is the trailer bed backed to a position wherein the rear end of the bogie "adjoins" the side of the flat car, as called for in Claims 11, 12, 14 and 15 of the '636 patent.

43. This is another critical limitation in the claims because no such limitation appeared in any of the claims as originally filed, but it was added to the claims during prosecution in an attempt to obtain their allowance. After adding this limitation, Felburn argued to the Patent

Office that the abutment of the bogie against the flat car constituted a significant distinction between his claimed invention and the prior art cited by the Patent Office.

44. In both the original Flexi-Van and the Mark III systems, by contrast, the backing of the trailer is stopped while the rear end of the bogie is still spaced from the ends of the skids on the turntable and the brakes on the bogie are locked before the backing of the tractor is resumed to shove the trailer body onto the turntable.

45. In the Mark III system, the trailer is not pushed "smoothly" over the bogie, and onto the railroad car "without considerable separation" between the trailer and bogie, as called for in Claims 11, 12, 14 and 15.

46. This is also a critical limitation in the claims because it was not present in any of the claims of the original application for the '636 patent as filed, but was added by amendment during prosecution of the applications in order to distinguish the claims from the prior art cited by the Patent Office.

47. In the Mark III system, by contrast, the trailer is cammed up off of the bogie by engagement of its lower rear corner with sloping surfaces at the outer ends of the skids of the turntable during backing movement by the tractor.

Validity

The Fellabaum '889 Patent

48. All of the elements recited in Claim 3 were old, having been employed in the freight handling systems disclosed in prior patents, in which they functioned in the same way and for the same purpose. No new or unexpected results were achieved by Felburn's combination of these elements into the systems claimed, and no ingenuity beyond that of an ordinary mechanic was involved in making such combination.

49. The McGregor U.S. patent No. 2,543,295, which was issued in 1951 on an application filed in 1946, was not cited by the Patent Office Examiner against the application for the Fellabaum '889 patent here in suit. However, every element recited in Claim 3 of the '889 patent is present, in similar relation, in the freight handling system disclosed by McGregor.

50. McGregor discloses a semi-trailer and tractor unit assembly including a trailer with its forward end removably supported by a tractor unit, and with a wheel unit adapted to support the rear portion of said trailer whereby the trailer is conjointly supported by the wheel and tractor units for movement along a roadway, the wheel unit being detachable from the trailer. The rear portion of the wheel unit terminates in a depending cam surface which is engageable with the load carrying platform of a vertical height slightly higher than that of said rear portion, whereby the tractor may back the trailer and wheel unit assembly against the platform with sufficient force to cam the rear portion upwardly to overlie the platform to provide for ready disassembly of the wheel unit from the trailer. McGregor also shows draft means connecting the wheel unit to the tractor for moving the wheel unit from a position underlying the trailer.

51. Since the foregoing comprise all of the essential elements of Claim 3 of the '889 patent, it is clear that Claim 3 is fully applicable to the system of McGregor.

52. The result accomplished by the operation of McGregor's system is identical with that of the Fellabaum '889 patent. McGregor leaves the trailer with its rear end supported at the edge of a loading platform and with its front end supported upon supporting legs, exactly as Fellabaum does.

53. The Menning U.S. Patent No. 2,-151,640, which was issued in 1939, discloses a truck supporting a removable cargo body. The rear end of the cargo body is adapted to engage a cam surface on a bumper block at the edge of a loading platform, whereby the truck can back the cargo body against the cam surface

and cam it up onto the loading platform to remove its weight from the truck. Then the truck can drive away, leaving the rear end of the cargo body supported by the load carrying platform and its forward end supported by jacks. Thus, the end result accomplished by Menning is identical with that accomplished by Fellabaum in his '889 patent system.

54. The Menning patent is a complete anticipation of all of the elements recited in Claim 3 of the '889 patent with the exception of the fact Menning's drawings illustrate a truck with a removable cargo body rather than a truck-trailer combination. Menning needs no separate draft means, since the longitudinal frame members of his truck serve the same function as Felburn's hitch by pulling the rear wheels from beneath the cargo body.

55. There was nothing novel about either a truck and semi-trailer combination or a separate hitch. A semi-trailer assembly with a slidable bogie is shown by the prior Zubatsky U.S. patent No. 2,-369,384 issued in 1945, while the hitch means is shown by the prior Alexander U.S. patent No. 2,038,156 issued in 1936.

The Felburn '636 Patent

56. All of the steps recited in Claims 1, 3, 4, 11, 12, 14 and 15 of the '636 patent were old, having been disclosed in prior patents and publications, in which they were employed in essentially the same way and for the same purpose. No new or unexpected result was achieved by Felburn's combination of these old steps into the methods claimed, and no ingenuity beyond that of an ordinary mechanic was involved in making such combination.

57. The Winn U.S. patent No. 1,541,-457, issued in 1925, was not cited by the Patent Office against any of the applications for the '636 patent. It discloses a semi-trailer and tractor assembly in which the front end of the trailer bed is detachably connected to the tractor through the semi-trailer frame with a multiple axle wheel unit supporting the rear portion of the trailer bed. Winn further discloses the loading of the cargo bodies onto a railroad car having turntables rotably mounted thereon by the successive steps of: rotating the turntables to a position transverse of the railroad car, backing the trailer by means of the tractor until it is adjacent the side of the railroad car, unlocking the cargo bodies from the wheel unit, pushing the cargo bodies smoothly over the wheel unit and onto the railroad car, and rotating the turntables and cargo bodies to a position parallel to the railroad car.

58. Winn discloses everything called for in Claim 11 of the '636 patent except (1) the use of a conventional "flat car," (2) the backing of the cargo bodies into actual contact with the railroad car, and (3) the use of the tractor for pushing the cargo bodies onto the rail car.

59. None of these missing features was novel at the time of Felburn's alleged invention. The prior Zubatsky U.S. patent No. 2,369,384, issued in 1945, discloses the use of a tractor to push a trailer from its removable bogie onto a conventional flat car. Claim 11 is thus fully anticipated by the combination of Winn and Zubatsky.

60. The McGregor U.S. patent No. 2,-543,295, issued in 1951, was not cited by the Patent Office against any of the applications for the '636 patent. McGregor discloses the backing of the trailer of a semi-trailer and tractor assembly by the tractor in a direction generally normal to the axis of a rail car until the rear end of the trailer adjoins and is generally level with the rail car and the wheel unit adjoins the side of the rail car. Then the wheel unit is unlocked from the trailer, and the trailer is slid onto the rail car by movement of the tractor, the wheel unit being simultaneously pulled from beneath the trailer. The trailer is then rotated on the turntable to a position parallel to the railroad car.

61. McGregor discloses all of the steps recited in Claim 11 of the '636 patent in suit except (1) the use of a con-

ventional "flat car" without a turntable, as defined by Felburn, and (2) the movement of the trailer onto the flat car by *backing* movement of the tractor while the wheel unit is stationary.

62. Both of these two features, lacking in McGregor, are disclosed by the prior Zubatsky patent. Thus, the entire combination of Claim 11 is also anticipated by the combination of McGregor and Zubatsky.

63. The additional step of registration of swivel means on a trailer with swivel means on a railroad car to form a pivot for rotation of the trailer to a position parallel to the car, as recited in Claims 1, 3, 4, 14 and 15 of the '636 patent, was not new, but is disclosed in the prior Ross U.S. patent No. 1,734,303 issued in 1929, and in the prior Francis U.S. patent No. 1,968,196 issued in 1934.

64. The additional steps of attaching a towing vehicle to one side of the front end of the trailer bed and using the towing vehicle to swing the trailer bed to a position parallel to the flat car, as recited in Claims 1, 3, 4 and 12 of the '636 patent, were not new, but are disclosed by a number of prior patents including the aforementioned Francis patent, the Nelson U.S. patent No. 2,782,054 issued in 1957 on an application filed in 1953, and the Gutridge U.S. patent No. 2,819,-687 issued in 1958 on an application filed in 1953.

65. Rudolf Behrens, the proprietor of a German trucking firm, published a brochure disclosing a freight handling system which is virtually identical to that described in the broadest claims of the '636 patent [pp. 46–47]. The first edition of this brochure was printed in June 1955 and was mailed out during the latter part of 1955. The second edition, was sent out shortly thereafter, with all the mailing being completed within four months after December 1955, before the filing date of Felburn's first application for the '636 patent. One or the other of these two versions of the publication was sent to one hundred firms in Europe and to forty-two firms in the U.S.A., including the leading manufacturers of trucks and trailers, railroads and trucking companies.

66. This Behrens publication was not cited by the Patent Office against any of the applications for the '636 patent.

67. The Behrens publication illustrates a semi-trailer and tractor assembly in which the bogie is slidable along the bottom of the trailer and removable therefrom for loading of the trailer onto a conventional railroad flat car. The trailer is backed up by the tractor transversely of the flat car to a position wherein the rear end of the trailer adjoins and is generally level with the upper surface of the flat car. At this point, the trailer is unlocked from the bogie to permit sliding of the bogie along the undersurface of the trailer. Then the backing of the tractor is resumed to push the rear end of the trailer onto the turntable. The rear end of the bogie engages the side of the flat car to prevent movement of the bogie as the trailer is slid onto the flat car. In one embodiment, shown in Figure 2 of the drawings of the publication, the trailer is pushed to a position wherein it is centered over the flat car. Thereupon, the front end of the bogie is connected to the rear end of the tractor by means of a hitch and the bogie is pulled by the tractor from beneath the trailer. Then the trailer is rotated to a position parallel to the freight car.

68. Every step recited in Claim 11 of the '636 patent in suit is fully anticipated by the system disclosed by Behrens.

69. The system disclosed by Behrens is fully operative. There are no defects in it except for omissions of routine construction detail which could be supplied by any mechanic. These details are the type which are frequently omitted from patent drawings, which may be merely a schematic indication of a principle of operation.

70. The Behrens publication constituted a printed publication disclosing the method covered by Claim 11 of the '636 patent which was published and distrib-

uted at least six months before the filing date of the first application for the '636 patent.

71. Felburn has not established either a reduction to practice of the invention of the '636 patent or any diligence toward such reduction to practice, prior to the filing date of his first application for such patent.

## Conclusions of Law

1. This Court has jurisdiction of the subject matter and of the parties.

2. The patents in suit, being only "paper patents" which were never used commercially, should be strictly construed.

3. Plaintiff is estopped by his amendments and arguments before the Patent Office to contend that the language of Claim 3 of the Fellabaum U.S. patent No. 2,693,889 is applicable to the freight handling equipment made, used or sold by defendants.

4. Said patent No. 2,693,889 has not been infringed by either of the defendants.

5. Plaintiff is estopped by his amendments and arguments before the Patent Office to contend that Claims 1, 3, 4, 11, 12, 14 and 15 of the Felburn U.S. patent No. 3,002,636 are applicable to the freight handling methods performed by defendants or with their equipment.

6. Said patent No. 3,002,636 has not been infringed by either of the defendants.

7. The failure of the Patent Office to cite the most relevant prior art against the applications for the patents in suit destroys the rebuttable presumption of validity which usually attaches to a granted patent.

8. Said patent No. 2,693,889 is invalid and void for lack of novelty and patentable invention.

9. Said patent No. 3,002,636 is invalid and void for lack of novelty and patentable invention.